IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Maxine Bent-Anderson, ) | C.A. No.: 6:19-1038-MGL-KFM |
| Plaintiff, ) | |
| ) | **REPORT OF MAGISTRATE JUDGE** |
| vs. ) | |
| ) | |
| Andrew M. Saul, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

This case is before the court for a report and recommendation pursuant to Local Civil Rule 73.02(B)(2)(a) (D.S.C.), concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

The plaintiff, who is proceeding *pro se*, brought this action pursuant to Section 205(g) of the Social Security Act, as amended (42 U.S.C. 405(g)) to obtain judicial review of a final decision of the Commissioner of Social Security denying her claim for disability insurance benefits under Title II of the Social Security Act.

**PROCEDURAL HISTORY**

The plaintiff filed an application for disability insurance benefits ("DIB") on March 12, 2015, alleging that she became unable to work on December 8, 2013. The application was denied initially and on reconsideration by the Social Security Administration. On March 15, 2016, the plaintiff requested a hearing. On December 7, 2017, an administrative hearing was held by video at which the plaintiff, who was represented by an attorney, appeared and testified in Greenville, South Carolina. The administrative law judge ("ALJ") presided over the hearing from Chattanooga, Tennessee,

---

[1]  A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

and Benjamin Johnston, Ph.D., an impartial vocational expert, appeared and testified at the hearing in Chattanooga.  On April 12, 2018, the ALJ considered the case and found that the plaintiff was not under a disability as defined in the Social Security Act, as amended (Tr. 104-14).  The ALJ's finding became the final decision of the Commissioner of Social Security when the Appeals Council denied the plaintiff's request for review on February 13, 2019 (Tr. 1-3).

In making the determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

> (1)  The claimant meets the insured status requirements of the Social Security Act through December 31, 2020.
>
> (2)  The claimant has not engaged in substantial gainful activity since December 8, 2013, the alleged onset date (20 C.F.R. § 404.1571 *et seq.*).
>
> (3)  The claimant has the following severe impairments: cervical and lumbar degenerative disc disease; shoulder dysfunction/rotator cuff fraying/tear; obesity; carpal tunnel syndrome; and obstructive sleep apnea (20 C.F.R. § 404.1520(c)).
>
> (4)  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526).
>
> (5)  After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b) except the claimant can only frequently handle and finger bilaterally; she can climb ramps and stairs, balance, kneel, stoop, crouch, and crawl occasionally; the claimant can occasionally reach overhead bilaterally; the claimant can never climb ladders, ropes, or scaffolds and should never work at unprotected heights or around dangerous machinery.
>
> (6)  The claimant is capable of performing past relevant work as an occupational health specialist, which was light, skilled work. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 C.F.R. § 404.1565).

2

(7) The claimant has not been under a disability, as defined in the Social Security Act, from December 8, 2013, through the date of this decision (20 C.F.R. § 404.1520(f)).

## APPLICABLE LAW

Under 42 U.S.C. § 423(d)(1)(A), (d)(5), as well as pursuant to the regulations formulated by the Commissioner, the plaintiff has the burden of proving disability, which is defined as an "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a).

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that meets or medically equals an impairment contained in the Listing of Impairments found at 20 C.F.R. Pt. 404, Subpt. P, App. 1, (4) can perform his past relevant work, and (5) can perform other work. *Id.* § 404.1520. If an individual is found not disabled at any step, further inquiry is unnecessary. *Id.* § 404.1520(a)(4).

A claimant must make a *prima facie* case of disability by showing he is unable to return to his past relevant work because of his impairments. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983). Once an individual has established a *prima facie* case of disability, the burden shifts to the Commissioner to establish that the plaintiff can perform alternative work and that such work exists in the national economy. *Id.* (citing 42 U.S.C. § 423(d)(2)(A)). The Commissioner may carry this burden by obtaining testimony from a vocational expert. *Id.* at 192.

Pursuant to 42 U.S.C. § 405(g), the court may review the Commissioner's denial of benefits. However, this review is limited to considering whether the

3

Commissioner's findings "are supported by substantial evidence and were reached through application of the correct legal standard." *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Id.* In reviewing the evidence, the court may not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Id.* Consequently, even if the court disagrees with Commissioner's decision, the court must uphold it if it is supported by substantial evidence. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## EVIDENCE PRESENTED

The plaintiff was 53 years old on her alleged disability onset date (December 8, 2013) and 57 years old on the date of the ALJ's decision (April 12, 2018). She has a bachelor's degree and a master's degree (Tr. 95, 124) and past relevant work as an occupational health specialist (Tr. 113, 135).

On November 1, 2012, the plaintiff had a lumbar MRI that showed bilateral facet arthropathy at L5-S1 and L4-L5. There was no evidence of disc herniation or central canal stenosis (Tr. 474). On April 24, 2013, she had an x-ray of her left knee that showed mild degenerative changes (Tr. 476).

On December 8, 2013, the plaintiff was treated in the emergency room following a motor vehicle accident. She reported hitting the left side of her head on the head rest after her taxi was struck from behind. She complained of contusion/hematoma located in the bilateral lower back, bilateral neck, and bilateral shoulder. She described her pain as aching, moderate to severe, and constant. A lumbar x-ray showed three large pelvic calcified leiomyomas in the uterus as well as degenerative narrowing at T11 -T12. The plaintiff was diagnosed with lumbar back pain and neck strain and was prescribed Valium and Vicodin (Tr. 443-53).

4

On December 10, 2013, Hillary Woodson Gaskins, M.D., the plaintiff's primary care physician, evaluated her for followup after the motor vehicle accident. She reported that she experienced immediate pain in the left side of her neck/head, as well as back pain. She complained of pain in her neck, low back, and head. Dr. Gaskins noted a trapezius spasm. Dr. Gaskins diagnosed cervicalgia and muscle spasm and prescribed Vicodin, diazepam, and ibuprofen (Tr. 718-19).

On December 16, 2013, James D. Nelson, M.D., evaluated the plaintiff for lower back pain. Portions of Dr. Nelson's records are handwritten and difficult to read. It was noted that the plaintiff had been in a motor vehicle accident earlier that month. In addition to lower back pain, she complained of left-sided head pain, neck pain, bilateral shoulder pain, abdominal pains, headaches, and dizziness. Dr. Nelson ordered blood work and MRIs (Tr. 617-20). The plaintiff had an electroencephalogram ("EEG") for complaints of head pain, memory problems, and inability to concentrate. The EEG showed no abnormalities (Tr. 483).

On December 19, 2013, the plaintiff had x-rays of her cervical spine, which showed reversed curvature and degenerative changes in the mid-cervical spine. A head CT showed no abnormalities (Tr. 481-82).

On December 23, 2013, Dr. Nelson reevaluated the plaintiff for neck pain. She reported that her neck pain was greatly increased with any exertion. She reported continued back pain that caused her to shuffle instead of walk because her pain was so severe. The plaintiff also reported bilateral arm and shoulder pain, headaches, and mild cognitive impairment. She indicated that something was disturbing her thought process and gave the example of typing and searching online and noticing the words and numbers she typed in were different from what she intended to write (Tr. 614-15).

On January 7, 2014, the plaintiff reported persistent neck pain and bilateral shoulder pain. She complained of headaches and bilateral hand weakness. She indicated

5

that her hand problems caused problems with her daily activities. She also reported feeling like her body was leaning to one side and that she felt like she was going to fall over. Dr. Nelson prescribed physical therapy. Dr. Nelson performed nerve conduction studies, which showed mild bilateral findings at C5 (Tr. 612-16, 662).

On January 10, 2014, Dr. Nelson evaluated the plaintiff for left hip pain. She reported continued neck, back, and right shoulder pain. She had difficulty falling asleep and problems falling back to sleep when she awakened at night. Dr. Nelson provided a summary of the plaintiff's history, findings, and diagnoses. An MRI was ordered, and she was to continue physical therapy and her medications. Dr. Nelson performed nerve conduction studies, which showed mild bilateral findings at L4-5 (Tr. 608-11, 661).

On January 14, 2014, the plaintiff had a cervical MRI showing degenerative osteoarthritis without evidence of disc herniation or central canal stenosis (Tr. 477).

On January 16, 2014, Dr. Nelson indicated that the plaintiff had been advised to remain out of work through February 4, 2014 (Tr. 607).

On January 28, 2014, Dr. Gaskins evaluated the plaintiff for followup and blood work after an automobile accident. The plaintiff reported that she had vomited once since her head injury and was using Voltaren topical and Feldene QD for pain. Dr. Gaskins diagnosed her with post-concussion syndrome, chronic pain syndrome, and tenosynovitis of the hand and wrist. Feldene was prescribed, and diazepam, Vicodin, and ibuprofen were discontinued (Tr. 717-18).

On February 3, 2014, Dr. Nelson evaluated the plaintiff for neck pain and multiple other complaints. She reported headaches and trouble staying focused. Her chronic pains continued (Tr. 605-06). On February 21, 2014, the plaintiff complained of bilateral shoulder pain, memory changes, and feeling like she "blanks out." She reported headaches and continued neck, bilateral shoulder, back, and leg pain (Tr. 604). On March 3, 2014, the plaintiff had continued neck and back pain as well as bilateral shoulder pain,

6

nausea, and abdominal problems. She reported that her memory change continued and that she had trouble following through on her thoughts. She lost her train of thought and forgot words that were part of her regular vocabulary. Dr. Nelson indicated that the plaintiff was to remain out of work through April 3, 2014 (Tr. 602-03, 609).

On March 4, 2014, Dr. Gaskins saw the plaintiff for followup. She complained of upper back pain and arthralgias. She stated that she had gone to a spa and felt sore the next day. The plaintiff admitted to experiencing multiple stressors with her daughter. Dr. Gaskins diagnosed her with muscle spasm and chronic pain syndrome. Dr. Gaskins restarted Feldene and continued her other medication (Tr. 715-16).

On March 7, 2014, Lori Thompson, Ph.D., evaluated the plaintiff. She reported that she felt mentally "fuzzy," in the sense that she had word finding problems and had difficulty completing simple multiplication problems in her head. She was unable to work due to injuries she suffered from a car accident. She had symptoms of depression and anxiety, including trouble sleeping, difficulty concentrating, sadness, and worry. Dr. Thompson noted a mildly depressed mood, but no cognitive impairments. Mental status examination was normal and revealed goal-directed and logical thought processes, with full affect, only mild depression, intact insight and judgment, intact memory, and normal vocabulary and fund of knowledge. Cognitive testing revealed no deficits in orientation, attention, language comprehension, language repetition, language naming, construction, memory, calculation, and reasoning. The plaintiff was diagnosed with major depressive disorder, single episode, mild and anxiety disorder, NOS. Dr. Thompson assured the plaintiff that her feelings and reactions were normal and discussed coping strategies (Tr. 697-98).

On March 13, 2014, Dr. Nelson evaluated the plaintiff for complaints of fatigue. The plaintiff reported that her fatigue prevented her from helping prepare dinner or washing dishes. She reported that she withdrew from Cymbalta at the end of February

7

and was unsure if this caused her fatigue. She also reported stress, continued headaches, dazed episodes, nausea, and memory changes in addition to her chronic pain complaints. She complained of not feeling as sharp as she was before and having difficulty finding the correct words. Dr. Nelson noted that the plaintiff's bilateral hand pain continued. The plaintiff explained that when she dried off from taking a shower, she was unable to use her third and fourth fingers on both hands without severe numbness and a slight tingling sensation. She rated her hand pain at six to eight out of ten. Dr. Nelson continued her physical therapy. Dr. Nelson also completed a summary of findings; provided a note indicating that the plaintiff should remain out of work through April 15, 2014; and, completed a continuing disability form (Tr. 592-96, 599). On March 24, 2014, the plaintiff described her head pain as sharp and radiating from the right temple to the occipital area. She rated her pain at eight out of ten. She reported having episodes of balance issues and dizziness. She also complained of abdominal problems and bilateral shoulder/arm pain. Dr. Nelson ordered various diagnostic tests. Dr. Nelson completed a summary regarding the plaintiff's history and findings (Tr. 586-91).

On March 25, 2014, Jeffery Chase, M.D., of Virgin Islands Orthopedics, evaluated the plaintiff for complaints of bilateral shoulder pain that began after her car accident in December 2013. She reported that after her taxi was hit from behind, she put her hands up against the divider to brace herself. Dr. Chase's physical examination showed diffuse tenderness over the bicep tendons and rotator cuff insertions, as well as a slightly positive Hawkins test bilaterally. The plaintiff's strength was five out of five. Dr. Chase noted tenderness over the trigger points, posteriorly. Dr. Chase indicated that the plaintiff's cervical MRI showed degenerative joint disorder. He continued physical therapy (Tr. 458-59).

On April 3, 2014, the plaintiff had a thoracic spine MRI, which showed mild scoliosis and mild degenerative changes (Tr. 486).

8

On April 7, 2014, Dr. Nelson evaluated the plaintiff for neck pain and weakness. She reported that it felt like she could not support her head. She also reported that her neck pain interfered with her ability to sleep. The plaintiff reported continued shoulder pain. She indicated that the severity of her pain had reduced with bilateral shoulder injections. The plaintiff also reported headaches and migraine auras. Dr. Nelson completed a continuing disability form. Dr. Nelson indicated that he had not released her to return to work. He provided a statement that the plaintiff should remain off work through May 13, 2014, and completed a summary of her history and findings. On April 23, 2014, she reported headaches and problems sleeping. She also reported continued neck and low back pain. Dr. Nelson continued her in physical therapy and prescribed Floricet, Inderal, and Maxalt. He also ordered a CT of the plaintiff's head (Tr. 577-83).

On April 26, 2014, Dr. Thompson saw the plaintiff for psychotherapy. She reported feeling worried that she was not going to be able to return to work due to her impairments. She spoke about issues involving coping with her chronic pain, including frustration and anxiety. She reported that she "still gets a little flustered/overwhelmed when too much is going on," but "cognitively things seem better." Dr. Thompson noted that the plaintiff walked slowly and gingerly, which made her appear older. The plaintiff had a mildly depressed mood (Tr. 699).

On April 29, 2014, the plaintiff had a head CT scan that showed no abnormalities (Tr. 660).

On May 6, 2014, Dr. Chase saw the plaintiff for followup. She reported that her shoulder injections had relieved her symptoms. However, she complained of pain radiating from the shoulder down the arm to the two middle fingers on the right side. She stated laundry and dish washing exacerbated her upper arm pain. An ultrasound of the right shoulder revealed a partial rotator cuff tear of the supraspinatus tendon and part of the infraspinatus tendon. Dr. Chase ordered an MRI of the right shoulder (Tr. 457).

9

On May 6, 2014, Dr. Gaskins saw the plaintiff for followup. She reported she still had headaches, which were aggravated by turning her neck. She stated that Dr. Nelson thought they were migraines. Dr. Gaskins found tenderness over the right trapezius muscle and pain with extreme range of motion in the left shoulder. He also found trace edema bilaterally from the plaintiff's lower shins distally (Tr. 714-15).

On May 9, 2014, the plaintiff had a shoulder MRI, which showed mild tendinosis of the supras pinatus tendon with trace interstitial tearing, mild tendinosis of the infraspinatus tendon, and a small subacromial spur and trace subacromial/subdeltoid bursitis (Tr. 650).

On May 13, 2014, Dr. Nelson evaluated the plaintiff, who complained of difficulty falling asleep and waking up during the night. She complained of anger and increased irritability. She explained that she has no patience due to her pain. She also reported constant headaches, light-headedness, right hand numbness, and continued lower back pain. Dr. Nelson recommended that she continue physical therapy and remain out of work. Dr. Nelson provided a statement indicating that the plaintiff should remain out of work until May 28, 2014. An MRI and physical therapy were ordered (Tr. 572-76).

On May 16, 2014, Dr. Chase saw the plaintiff for followup after her right shoulder MRI. The plaintiff reported experiencing some increased weakness on the right versus the left. Dr. Chase noted that the MRI confirmed her recent ultrasound findings. He recommended continuing physical therapy (Tr. 456). She was also evaluated by Dr. Thompson for psychotherapy. She reported that recent physical weakness was causing her emotional symptoms of sadness and hopelessness. She reported trouble sleeping. Dr. Thompson noted that the plaintiff appeared glum, downcast, and anxious. Her physical movements were slow and careful. Her thought content, facial expressions, and general demeanor were depressed (Tr. 700).

On May 19, 2014, Dr. Nelson evaluated the plaintiff for neck pain. She had difficulty falling and staying asleep. She rated her shoulder pain at six to eight out of ten. Dr. Nelson indicated that he would give her a prescription for a cervical pillow. Dr. Nelson also completed a continuing disability claim form. Dr. Nelson indicated that she was last treated on May 19th and that she had not been released to return to work (Tr. 570-71).

On May 21, 2014, the plaintiff complained of left leg weakness. She also reported persistent right-sided headaches. She reported she had been experiencing some "weirdness" in her head as if she was "blanking out" instead of passing out. Dr. Nelson ordered CT scans, brain MRI, and vascular studies to evaluate her headaches. He performed an EEG, which showed mild intermittent generalized disturbance of cerebral activity that was felt to be due to drowsiness (Tr. 565-69, 645).

Also on May 21, 2014, Jennifer Miller, D.O., saw the plaintiff for complaints of a headache "going through her shoulders." Dr. Miller recommended that she go to the emergency room for treatment for possible stroke, but she elected to see Dr. Nelson first (Tr. 713-14).

On May 28, 2014, Dr. Nelson provided a statement indicating that the plaintiff was under his care and should remain out of work from May 28 through June 27, 2014. He also completed a continuing disability form. The plaintiff had a CT scan of her neck, which showed degenerative disc disease at the C45 and C5-C6 levels, and posterior osteophytes were noted at the C5-6 level (Tr. 524-25, 648).

On June 2, 2014, the plaintiff had an MRA of her brain, which was normal (Tr. 647). On June 9, 2014, she had a brain MRI for complaints of headaches, which showed no abnormality (Tr. 495). On June 20, 2014, she had an MRI of her left shoulder, which showed interstitial tearing of the infraspinatus and supraspinatus tendons with bursal sided fraying (Tr. 496).

11

On June 23, 2014, Dr. Nelson evaluated the plaintiff for increased neck and shoulder pain. She also complained of memory changes returning. She reported increased difficulty with finding the right words to say and getting "stuck" mid-sentence. She reported that she had this problem before, and it had cleared up. It had returned over the past three weeks. The plaintiff also reported burning under her feet. Dr. Nelson provided a summary regarding the plaintiff's injuries. He indicated that she was a passenger in a taxi involved in a collision resulting in multiple traumas including headaches, increased neck pain into her shoulders, and increased back pain with trigger points. The plaintiff was taking diclofenac and Flexeril and still needed a cervical pillow. Dr. Nelson provided a work statement indicating that the plaintiff was disabled from June 23 to August 1, 2014 (Tr. 518-23).

On June 24, 2014, Dr. Chase saw the plaintiff for followup regarding her bilateral shoulder pain. He noted tenderness over her paracervicals. Her left shoulder MRI showed a small bursal sided partial rotator cuff tear/fraying. He suggested that she continue physical therapy and follow up in six weeks (Tr. 455).

On July 10, 2014, Dr. Nelson evaluated the plaintiff for neck, shoulder, and back pain. She reported that her pains were intermittent and between a five and seven out of ten on the pain scale. Dr. Nelson noted that she had seen a rheumatologist. Dr. Nelson completed a continuing disability claim form. She suffered from cervical and lumbar discogenic disease as well as post-concussion syndrome. Dr. Nelson had not released her to return to work (Tr. 517-19).

On July 11, 2014, Dr. Thompson saw the plaintiff for psychotherapy followup. She reported that her physical pain had decreased, and she was feeling better emotionally. She complained of continued neck and shoulder problems as well as burning in her feet. Dr. Thompson encouraged her to practice self-care techniques. Dr. Thompson also encouraged her to engage in social interactions with others, noting that now that she was

not working, and she was more isolated, which was likely increasing her depressive symptoms  (Tr. 701).

On July 31, 2014, Dr. Nelson provided a statement indicating that the plaintiff was to remain out of work from July 31 to August 19, 2014 (Tr. 514).  On August 18, 2014, she reported intermittent neck and lower back pain.  She also complained of bilateral shoulder pain and left lower leg pain and swelling (Tr. 513).  On August 19, 2014, Dr. Nelson provided a statement indicating that the plaintiff was found physically able to return to work on a trial basis on August 25, 2014, but only for three to five hours and in the office, not in the field (Tr. 511-12).  On August 21, 2014, Dr. Nelson provided a summary of the plaintiff's condition and noted that she would have a trial of return to work for three and a half hours a day beginning on August 25, 2014 (Tr. 561).  Dr. Nelson provided a statement indicating that the plaintiff had been advised to remain off work from August 19 to August 25, 2014.  He provided a summary of her history and treatment (Tr. 500, 560).  On August 27, 2014, Dr. Nelson evaluated the plaintiff for neck pain and recurrent right-sided headaches.  She indicated that the intensity of her pain varied.  She also indicated that her right shoulder pain was constant with activity.  She reported a distinct right arm weakness and an inability to perform tasks such as putting clothes in her closet or holding items weighing more than three pounds (Tr.  510).

On September 9, 2014, Dr. Gaskins saw the plaintiff for followup after she had experienced diffuse electrical pain.  She complained of numbness along the soles of her feet.  Dr. Gaskins noted there was no working diagnosis at that time but that the plaintiff had seen a rheumatologist who thought she might have Sjorgren's.  Dr. Gaskin's diagnoses included muscle weakness, chronic pain syndrome, myalgia, and myositis (Tr. 712).

On September 11, 2014, Dr. Nelson wrote a note stating that the plaintiff was able to try a trial of work for three and a half hours daily, with no over the shoulder work.  Dr. Nelson also ordered physical therapy and a CT of the cervical spine.  His handwritten

notes are largely illegible.  Dr. Nelson noted that the approximate date that the plaintiff's condition commenced was December 8, 2013, and that the duration was indefinite.  Dr. Nelson noted that the plaintiff was seen in the emergency room and then was treated with medication and physical therapy.  She was unable to perform her job functions due to her condition and explained that she should not be on her feet all day.  He noted that she was set to return to work for three and a half hours per day in the office only with no field work.  The plaintiff was having intermittent headaches, right sided neck pain, right shoulder pain, and low back pain.  Dr. Nelson indicated that the plaintiff was incapacitated from December 8, 2013, to August 24, 2014, and would need a reduced schedule due to her medical condition.  Her condition would cause periodic flare-ups that would prevent her from performing job functions and cause absences during those flares.  He estimated these flare-ups to occur one time per month and last for five days.  Dr. Nelson stated, "We will need to see how pt responds to trial of return to work beginning @ 3/5 hours/day" (Tr. 502-08).

On September 16, 2014, the plaintiff complained of continued intermittent, throbbing headaches at the base of the head.  She felt tension/pressure come from the occipital area that spread out to the parietal areas.  There was also associated dizziness, lightheadedness, and neck pain.  She rated her pain a seven out of ten.  She complained of continued bilateral shoulder pain, lower back pain, and swelling in her feet.  Dr. Nelson noted she had missed six days of work in the previous three weeks (Tr. 501).  On September 18, 2014, Dr. Nelson indicated that the plaintiff was ready to return to work on a trial basis on September 18, 2014, for three and a half hours a day.  He stated, "However, repetitive movements of arms pulling files from high shelves caused severe aggravation of her pain.  Lately she has also developed dizzy spells.  She has missed 6 days during the last 3 weeks."  Dr. Nelson indicated that he advised the plaintiff to remain off work for one

14

month, and she would be reevaluated after that time.  Dr. Nelson performed an EEG, which was normal (Tr. 553, 640).

On September 19, 2014, the plaintiff had a cervical MRI, which showed multilevel discogenic and hypertrophic changes with foraminal narrowing (Tr. 639).

On September 26, 2014, Dr. Thompson saw the plaintiff for psychotherapy. She appeared flat, downcast, mildly depressed, and anxious.  Results of her Milton Clinical Multiaxial Inventory suggested generalized anxiety disorder (Tr. 702-03).

On October 1, 2014, Dr. Nelson evaluated the plaintiff for followup of headaches.  She reported that her headaches continued and were intermittent.  She described her pain as throbbing aches in the base of her skull with tension and pressure. She reported that her pain was severe on the right side and mild on the left.  She rated her headache pain at six plus out of ten.  The plaintiff also reported continued bilateral shoulder/arm pain and lower back pain.  Dr. Nelson provided a statement indicating that the plaintiff had been under his care following a motor vehicle accident in December 2013. He noted that she returned to work on August 25, 2014, for three and a half hours per day but was unable to tolerate this due to increased pain.   He explained that no accommodations were needed at that time since she was on leave for a month.  Dr. Nelson indicated that she would be reassessed on October 16th, and at that time a full detailed list of recommendations would be given.  Dr. Nelson stated, "Her return to work date is indefinite."  Dr. Nelson noted that the plaintiff might never be able to return to work (Tr. 562-64).

On October 16, 2014, the plaintiff complained of headaches, neck pain, bilateral shoulder pain, and low back pain.  She reported that her headaches were more frequent on the right, and she rated her pain at eight out of ten.  Dr. Nelson provided a summary discussing the plaintiff's condition.  He noted that she was advised to continue diclofenac and Flexeril.  She had been taken out of work and was unable to return at that

time. She was to continue physical therapy and would be reevaluated in November. Dr. Nelson also provided a statement indicating that the plaintiff was seen for increased neck pain radiating to her shoulders. Her pain was aggravated by sitting at the computer and doing small things around the house. The plaintiff had more anxiety concerning her condition and would be referred for counseling in addition to physical therapy. He stated, "She is motivated to return to work but is just not capable of returning to work at this time. Mrs. Anderson will be reevaluated in my office on November 17, 2014" (Tr. 549, 558-59).

On November 14, 2014, the plaintiff complained of headaches, which she stated were constant and sometimes woke her from sleep due to excruciating pain. The plaintiff also reported that her memory changes continued but seemed to be improving. She complained of dizziness and neck, bilateral shoulder, bilateral hand, and left hip pain. She had been prescribed Zoloft, but it was discontinued due to side effects. She was followed by Dr. Thompson for anxiety. Dr. Nelson examined the plaintiff and advised her to remain off work until November 21, 2014. She would be able to return on a trial basis of three and half hours a day beginning November 24, 2014. Dr. Nelson indicated that her return to work should not include over the shoulder work since pulling files from high shelves tended to aggravate her pain and that she was only allowed to work in the office and not in the field. Dr. Nelson completed a summary of her history and findings (Tr. 548-56). On November 21, 2014, Dr. Nelson provided a summary noting the plaintiff's history, physical findings, and diagnoses. She had developed increased neck pain and pain into her shoulders and was unable to return to work due to increased pain (Tr. 543).

On November 25, 2014, Dr. Nelson evaluated the plaintiff for multiple complaints including left hip pain, difficulty sleeping, neck pain, dizziness, bilateral shoulder pain, and lower back pain. She reported that her pain levels varied and worsened with activities. Dr. Nelson stated that she was unable to return to work, and he advised her to apply for Social Security disability. Dr. Nelson provided a summary noting her history,

physical findings including tenderness and spasms, and her diagnoses. The plaintiff was to continue physical therapy and acupuncture. She had been unable to return to work and would be reevaluated on December 18, 2014. He also provided a statement indicating that, following her motor vehicle accident, the plaintiff had returned with increased lower back pain radiating to her left hip. The pain made her unable to walk normally. The plaintiff was motivated to return to work on November 24, 2014, but was only able to take small steps which prevented her from returning. Dr. Nelson indicated that she would be reevaluated in his office on December 18, 2014, and at that time it would be determined whether or not she would be physically able to return to work on January 5, 2015 (Tr. 542-47).

On December 2, 2014, Dr. Thompson saw the plaintiff for psychotherapy. She reported that she had been scheduled to go back to work part-time, but woke up and could barely walk. The plaintiff stated that she had made peace with the fact that she would need to resign from her position due to her impairments. She stated that, over all, things were improving, and she refused to get stressed out, learning to take things one day at a time. Dr. Thompson noted that the plaintiff appeared calm, walking slowly and gingerly, and was attentive, fully communicative, well groomed, and emotionally relaxed but physically in discomfort (Tr. 704).

On December 18, 2014, Dr. Nelson evaluated the plaintiff. She complained of left hip pain, dizziness, neck pain, bilateral shoulder pain, and lower back pain. Her difficulties with daily activities were noted (Tr. 541).

On December 29, 2014, Catherine Beaudreau, N.P., evaluated the plaintiff during a well woman check. Physical examination showed, among other things, edema. Ms. Beaudreau noted that the plaintiff already elevated her legs, and she suggested a trial of compression stockings (Tr. 710-11).

On January 29, 2015, Dr. Nelson evaluated the plaintiff for followup of multiple chronic conditions. She reported neck pain, which she described as stiffness with

17

intense aches.  She reported that her neck pain radiated down into her shoulders and upper back. She reported upper arm and bilateral wrist pain and weakness.  She also reported continued lower back pain with decreased ability to ambulate.  She had headaches. Dr. Nelson provided a summary noting the plaintiff's diagnoses and indicating that she should continue physical therapy and start acupuncture (Tr. 531, 538).

On February 26, 2015, Dr. Nelson provided a summary of the plaintiff's diagnoses and indicating that she should continue her current treatment regimen (Tr. 530). On March 19, 2015, Dr. Nelson evaluated her for memory problems.  She reported having difficulties finding words and mixing up words.  She complained of increased neck pain radiating into her shoulders and lower back pain into her left buttock.  She complained of intermittent headaches, which she rated at eight out of ten on the pain scale.  She also complained of constant bilateral ankle and foot pain.  Dr. Nelson continued the plaintiff's current treatment regimen and prescribed physical therapy.  Dr. Nelson also provided a summary of the plaintiff's diagnoses and indicated that she had received acupuncture, physical therapy, and psychiatric treatment (Tr. 529-33, 795-96).

On April 1, 2015, Dr. Thompson saw the plaintiff for followup after a setback with her physical symptoms.  She reported that she had been formally terminated from her job, which came as quite an "emotional blow."  She appeared glum, tense, and depressed (Tr. 705).

On April 16, 2015, Dr. Nelson evaluated the plaintiff for headaches.  She complained of memory changes and forgetfulness.  She occasionally lost her train of thought and forgot what she was going to say.  She reported episodes of dizziness, which came on suddenly.  Dr. Nelson questioned whether these might be panic attacks.  Dr. Nelson provided a summary of findings regarding the plaintiff.  She also complained of headaches and pain throughout her body. Dr. Nelson prescribed physical therapy (Tr. 624-30).  On May 18, 2015, the plaintiff complained of lower back pain, exhaustion, and

18

insomnia.  She also complained of headaches but indicated that they were less frequent, as well as continued dizziness and neck, bilateral shoulder, right hand, lower back, and groin pain.  She complained she had heaviness in her limbs, which lasted two to three hours.  Dr. Nelson noted that activities like holding a phone were painful to her hands and wrists.  He continued her physical therapy and gave her splints to use (Tr. 625-27).

On July 2, 2015, the plaintiff reported that her headaches were predominantly on the right side.  She indicated that her bilateral shoulder and arm pain interfered with activities such as self-care and that her lower back pain interfered with her ability to take a full stride.  She also complained of headaches, sleep problems, anxiety, and depression. The plaintiff was still seeing Dr. Thompson.  Dr. Nelson added Inderal to her medications and provided a summary of findings and treatment (Tr. 810-13).

On August 24, 2015, Dr. Nelson evaluated the plaintiff for neck pain radiating into her shoulders, right worse than left.  She reported that her headaches were more frequent.  She reported that all of her symptoms worsened with prolonged sitting or standing.  Dr. Nelson provided a statement indicating that he first saw the plaintiff on December 16, 2013, and had seen her at least monthly since then.  Dr. Nelson indicated that the plaintiff was able to return to work briefly on August 25, 2014, to work three and a half hours daily, but that she was unable to continue this and was only able to work three weeks with many days off.  The plaintiff had not been able to work since September 2014. He stated, "She is currently on disability through her former employer and has applied for social security" (Tr. 800-09).

On August 24, 2015, the plaintiff underwent sleep testing, which showed moderate obstructive sleep apnea becoming severe during REM sleep and associated with significant oxygen desaturation as well as post traumatic hypersomnia (Tr. 821-22).  On August 25, 2015, she underwent a CPAP titration study.  She had complaints of non-refreshing sleep and excessive daytime sleepiness.  She had significant improvement

19

with CPAP titration and was scheduled to have a CPAP mask and machine with heated humidifier for home use (Tr. 819-20).

On September 2, 2015, Scott Hartshorn, M.D., performed a consultative examination of the plaintiff. She reported having pain in her neck and shoulders, right greater than left. She reported that she could not sit too long and could not lift heavy items. Dr. Hartshorn noted treatment records and medications. The plaintiff rated her average daily pain at seven out of ten. She also reported brain fog that had increased after accident, which occurred with and without migraines. She could not walk long distances due to pain across her lower back. She reported no radiating pain but possible tingling in her legs. She had no problem getting out of her chair and onto the scale. She turned her chair toward the examiner to avoid rotating her neck. Dr. Hartshorn found no loss of range of motion, but neck rotation produced pain. He found no muscle atrophy and full strength. Squatting produced knee pain, and toe and heel walk produced hip pain. Examination was within normal limits, and Dr. Hartshorn could not confirm her brain fog as disability. Dr. Hartshorn completed a medical source statement, indicating that the plaintiff could occasionally and frequently lift and carry ten pounds, stand and walk about six hours in an eight-hour workday, and sit about six hours in an eight-hour workday. The plaintiff would need to periodically alternate between sitting and standing. Pushing and pulling were limited in her upper extremities. Dr Hartshorn stated, "No clinical findings to support disability. All limits are by history only. Does have cervical MRI consistent with multilevel degenerative disc disease." The plaintiff could occasionally perform all postural limitations and was unlimited in all manipulative, visual, and environmental limitations (Tr. 782-89).

On September 24, 2015, Dr. Nelson evaluated the plaintiff for neck pain. She described her pain as a throbbing sensation that radiated into her bilateral shoulders and upper arm area. Associated symptoms included numbness, weakness, heaviness , fatigue, headache, and tingling in her bilateral hands and fingers. Dr. Nelson noted the plaintiff had

20

obstructive sleep apnea and indicated that they would do a multiple sleep latency test ("MSLT") after using a CPAP machine for one month.  Dr. Nelson completed a summary of essential findings and provided a referral for a CPAP evaluation (Tr. 802-05).  On October 28, 2015, the plaintiff reported that her lower back pain was constant and daily. She also complained of brain fog and sleepiness.  Dr. Nelson indicated that she could have complex regional pain syndrome.  Dr. Nelson prescribed Provent for her moderate obstructive sleep apnea (Tr. 797-99).  On December 23, 2015, the plaintiff described her headaches as an uncomfortable, crawling sensation and an "assault on her brain."  She rated her pain at eight to nine out of ten and indicated that she had associated symptoms of fatigue, back pain, and abdominal pain.  She had numerous other complaints including neck pain, dizziness, memory issues, word finding problems, and bilateral wrist, hand, and finger weakness.  She indicated that she was not able to unscrew a water bottle cap (Tr. 792-94).

On February 20, 2017, Joanna Rose Serieno, N.P., at Cypress Internal Medicine, evaluated the plaintiff to establish care.  Ms. Serieno noted that the plaintiff had been in an accident in 2013 and that since the accident she struggled with neck, shoulder, arm, back pain.  The plaintiff reported taking diclofenac with mild relief and seeing a massage therapist, which helped.  She also reported suffering from migraine and headaches, weakness in her upper extremities, and depression and anxiety.  The plaintiff admitted that she struggled with her mood, feeling down, and not being interested in activities she used to enjoy.  She reported that the disabilities she sustained in her car accident also affected her mood and made her feel sad and anxious.  She complained of fatigue and weakness.  The plaintiff had decreased grip strength bilaterally.  She had a depressed mood. Ms. Serieno diagnosed moderate episode of recurrent major depressive disorder, anxiety, and weakness in both arms.  Ms. Serieno prescribed Lexapro and made a neurology referral (Tr. 823-28). On March 28, 2017, Fiby Abd El Malek, M.D., a physician

in Ms. Serieno's office, evaluated the plaintiff. Dr. Malek noted that she had multiple chronic medical problems including depression, hypercholesterolemia, hyperlipidemia, and chronic migraine. Dr. Malek ordered blood work and continued current medications (Tr. 970-76).

On April 3, 2017, David Zuflacht, M.S.C., P.T., D.P.T., Ph.D., provided a statement regarding the plaintiff. Dr. Zuflacht indicated that she had been under his care from December 27, 2013, to April 8, 2016. It was noted that she was involved in a motor vehicle accident in December 2013, and, during the initial assessment, it appeared that the plaintiff had sustained a severe concussion. Although she was alert and oriented to time, place, and date, it was clinically evident that she was unable to recall recent events related to the motor vehicle accident and events that transpired following the traumatic event. She had difficulty recalling what happened after the accident, as well what types of examinations and tests were conducted at the hospital. Objective examination showed that her cervical range of motion was extremely limited in all planes with significant pain occurring during cervical rotation, flexion, extension, and lateral flexion. She could not laterally flex her cervical spine greater than ten degrees bilaterally, and her flexion and extension were limited. Her cervical rotation was approximately 20 degrees bilaterally, which negated her ability to drive a car. She was also affected by severe myofascial trigger points in her cervical paraspinals, her upper trapezius, and rhomboids as well as multiple painful trigger points in various regions from her medial scapulas to her dorsal and lumbar spine. She complained of moderate to severe headaches, which he suspected were related to both occipital paraspinal spasm and post-concussion syndrome with concomitant migraine. Dr. Zuflacht stated, "This ultimately resulted in an inability for Miss Anderson to focus or concentrate during her activities of daily living." The plaintiff presented with moderate to severe tenderness to palpation of her dorsal and lumbar paraspinals along with upper and lower extremity muscle weakness, which he attributed to possible cervical,

dorsal, and lumbar sprain/strain along with the possibility of a cervical and lumbar spinal nerve root irritation. She had an antalgic gait.

Dr. Zuflacht indicated that he discussed with the plaintiff at length the regular usage of an assistive device during ambulation to aid with balance and to avoid catastrophic falls. She was observed trying to get into and out of a vehicle, which was noted to be a slow, cumbersome process. Dr. Zuflacht observed her moving from sit to stand and noted that she had difficulty and required the use of both rails on the chair to achieve a standing position. During her course of treatment over approximately 28 months, the plaintiff was diligent about her appointments. It was noted that while attempting to progress her from non-impact to gentle treadmill training, six months into her treatment, she could not tolerate the treadmill. Although they tried multiple times over a lengthy period, they were never able to get her to tolerate using the treadmill. She constantly complained of dizziness, which was an immediate red flag to remove the patient from the treadmill. Dr. Zuflacht suspected that she was still affected by post-concussion syndrome. Dr. Zuflacht indicated that when he would push her to become more aggressive with the use of cervical traction, she would consistently complain of dizziness and pain, and he was forced to focus only on performing gentle stretches and strengthening and very light manual therapy. Dr. Zuflacht indicated that with her physical rehabilitation ongoing, she began to seek out treatment from alternative providers in order to find some method of pain relief including acupuncture. The plaintiff reported initially that she did obtain some relief with acupuncture, but following multiple sessions, she reported that she was no longer progressing towards functional goals and reductions in pain.

Dr. Zuflacht explained that over the ensuing months, they continually worked on improving her range of motion and worked on gentle balance training and increasing her level of endurance and subsequent tolerance with prolonged standing and prolonged ambulation. The modalities that appeared to produce the best functional outcomes were

heat, interferential current, stretches, and gentle strengthening along with multiple manual therapy techniques.  Over time, it appeared that the plaintiff had plateaued and that her cervical range of motion was still very limited with her body prone to flares of pain, which would negate her ability to rotate her cervical spine greater than 20 degrees bilaterally. Her lumbar range of motion never improved beyond 30 degrees of lumbar flexion, 15 degrees of lateral flexion bilaterally, and her lumbar extension never exceeded 15 degrees. She had great difficulty performing simple functional tasks such as safely picking up objects dropped on the floor due to pain and lower extremity weakness.  Her upper extremity shoulder range of motion slightly improved, but flexing or abducting her arms and shoulders greater than 110 degrees would cause her to develop significant pain.  The plaintiff was constantly affected by tendinopathies in her rotator cuffs bilaterally, along with suspected carpal tunnel syndrome and related weakness secondary to nerve damage.  She had difficulty sitting for extended periods of time due to low back pain, and it required her extended periods of time to perform tasks that required manual dexterity.  Her sitting tolerance was poor, which required her to take frequent breaks every five to ten minutes. Dr. Zuflacht indicated that diligently working to strengthen her forearm flexors and extensors. along with stretching and manual therapy, never resulted in curing her medial and lateral epicondylitis.  She became frustrated with the lack of response to treatments of various sorts and became very depressed.  Since Dr. Zuflacht initially evaluated the plaintiff, she had complained of "brain fog," which was often associated with post-concussion syndrome.  He noted that she had at one time told him that another physician told her she probably had fibromyalgia brought about by the violent impact of the motor vehicle accident.  Dr. Zuflacht indicated that medical guidelines state that conditions such as sprains and strains typically are resolved in six to 12 weeks, but different people respond to different treatments in different ways.  The plaintiff exhibited symptoms far beyond the textbook definition of a sprain/strain up until the last day he saw her, which he

24

felt was likely caused by bulging discs in her cervical and lumbar spine, resulting in nerve root irritations, which in turn caused muscle spasms in her cervical and lumbar spine. Dr. Zuflacht indicated that the plaintiff ultimately qualified for permanent disability through Social Security due to the profound functional deficits. Dr. Zuflacht stated, "It is in my professional opinion that she is permanently, functionally disabled. Due to her ongoing medical conditions concomitantly affected by severe depression, it is my professional opinion that she is completely disabled and will never be able to perform functional duties at any job even if it requires light duty." Dr. Zuflacht indicated that there were days when the plaintiff was not able to get out of bed. He stated, "She is unfit to work by any functional definition" (Tr. 856-61).

On April 10, 2017, Ms. Serieno evaluated the plaintiff for complaints of intermittent headaches behind her eyes, feelings of being lightheaded, and fatigue more than usual. Ms. Serieno indicated that the plaintiff's headaches could be related in allergic rhinitis and added Flonase to her medications. Her mood, affect, and behavior were all normal. The plaintiff appeared to be tolerating Lexapro, which was continued for her moderate major depressive disorder (Tr. 829-35). On May 1, 2017, she reported chronic pain and fatigue. Ms. Serieno continued the plaintiff's current treatment regimen (Tr. 988-95).

On May 11, 2017, Jagannadha Rao Avasarala, M.D., a neurologist, evaluated the plaintiff for complaints of neck and shoulder pain and upper extremity weakness. Dr. Avasarala indicated that the plaintiff had a history of obstructive sleep apnea but had not been using a CPAP. Her claims of memory issues and trouble formulating words were noted, and she was offered neuropsychology testing to uncover cognitive issues. Her strength testing was deferred due to chronic back pain. Upper extremity evaluation was limited by pain in her neck and shoulders. Deep tendon reflexes were hyporeflexic. Her sensation was intact and her gait was antalgic. Dr. Avasarala diagnosed cervical pain

possibly related to whiplash injury, and he referred her for an orthopaedic examination. He also diagnosed cervical myofascial strain, weakness in both arms, and obstructive sleep apnea. He indicated that the plaintiff needed to be back on her CPAP (Tr. 921-28).

On May 16, 2017, Ms. Serieno evaluated the plaintiff for followup of chronic lower back pain. She reported that sitting and standing were creating more pain than usual. She indicated that her pain was on both sides. She also reported that her depression had improved since starting medication and that she was feeling more like herself. It was noted that her recurrent major depressive disorder was in full remission. Ms. Serieno found decreased range of motion and tenderness in the plaintiff's back. She prescribed diclofenac and Prozac and recommended heat and light stretching (Tr. 836-41).

On June 27, 2017, Stanley Wayne Darnell, N.P., initially evaluated the plaintiff for cervical myofascial strain. She complained of eight out of ten pain starting in her neck and radiating down into her bilateral shoulders. She also complained of pain in her left wrist and her lower back, as well as upper extremity weakness. Mr. Darnell noted that her shoulder pain never resolved despite physical therapy. She had an antalgic gait and diminished reflexes. She had tenderness in her paraspinous bilaterally and lower midline. Her sensation was decreased to light touch in her lateral elbow. She had less than full strength in her upper extremities, straight leg raise produced back pain and proximal leg pain bilaterally, and motor strength and sensation in the lower extremities were normal. She displayed objective weakness in her bilateral upper extremities and had positive Hoffmann signs on the left and right. She had failed conservative measures, and Mr. Darnell ordered updated MRIs (Tr. 864-78).

On July 6, 2017, the plaintiff had a lumbar MRI, which showed mild multilevel spondylosis of the lumbar spine, findings suggestive of facet synovitis of the lower lumbar spine, and complex lesion in the pelvis, which was partially imaged (Tr. 881-83). On July

26

7, 2017, the plaintiff had a cervical MRI, which showed cervical spondylosis, C5 -6 mild right foraminal narrowing, and C6-7 severe left-sided facet arthropathy (Tr. 879-80).

On August 10, 2017, Ms. Serieno evaluated the plaintiff for chronic neck and back pain. MRIs showed cervical and lumbar spondylosis and facet synovitis in the lower lumbar spine. The plaintiff was referred to pain management. She was also suffering from headaches that had decreased in frequency since starting propranolol, but she still had breakthrough migraines that were significant and debilitating. Ms. Serieno increased her dose of Inderal (Tr. 842-48).

On August 28, 2017, Dr. Avasarala evaluated the plaintiff for followup of bilateral shoulder pain and weakness. He administered shoulder injections (Tr. 929-37).

On August 28, 2017, Martha B. Shepard, P.A., evaluated the plaintiff for complaints of bilateral shoulder pain rated at seven out of ten. The plaintiff reported ongoing weakness that had been present since 2014. Ms. Shepard noted the motor vehicle accident and resultant treatment trials. The plaintiff reported no real improvement in her symptoms with conservative treatment. She complained of nighttime pain affecting her sleep. She was exquisitely tender to palpation at her bilateral AC joints and bilateral bicipital grooves. She actively forward elevated to 160 degrees bilaterally with lateral shoulder discomfort and external rotation at sides to 40 degrees. The plaintiff was quite painful with impingement testing bilaterally. She had weak cuff testing with pain precluding accurate assessment. Ms. Shepard noted bilateral SILT C5-T1 nerve distribution. Ms. Shepard took x-rays, which showed well aligned glenohumeral joints. The plaintiff's right shoulder showed well maintained glenohumeral joint space, twelve millimeter acromiohumeral distance, and type two acromion. Her left shoulder showed slightly decreased glenohumeral joint space, loose body noted inferior glenoid, cystic changes in the humeral head, and type two acromion. Ms. Shepard administered shoulder injections and ordered updated MRI studies (Tr. 949-54). On September 18, 2017, the plaintiff

27

reported that the injection helped some with pain, but she continued to have weakness. She rated her pain at seven out of ten. She had additional injections (Tr. 955-68). On September 26, 2017, the plaintiff had a physical therapy intake with ATI Physical Therapy (Tr. 884-86).

At the hearing on December 7, 2017, the vocational expert identified the plaintiff's past relevant work as an occupational health specialist, *Dictionary of Occupational Titles* ("*DOT*") no. 168.167-062, which is light and skilled work with a specific vocational preparation ("SVP") or 6 (Tr. 135). The ALJ asked the vocational expert the following hypothetical:

> I'd like for you to assume a hypothetical individual of the same age, education and vocational profile as the Claimant who could lift and carry 20 pounds occasionally, 10 pounds frequently, can sit for six hours in an eight hour day, could stand and/or walk for six hours in an eight hour day. Can occasionally climb ramps and stairs, balance, kneel, stoop, crouch and crawl, but could never climb ladders, ropes or scaffolds, work at unprotected heights or with dangerous machinery. They'd be limited to the frequent bilateral handling and fingering and would be limited to occasional bilateral overhead reaching. Could the hypothetical individual perform any -- or perform the Claimant's past work?

(Tr. 135-36). The vocational expert indicated that the plaintiff's past work would be available, both as actually and generally performed. Next, the ALJ asked the vocational expert if the plaintiff's past work would be available if the person had to change positions every 20 minutes. The vocational expert indicated that there would be no work (Tr. 136). The plaintiff's attorney asked if the plaintiff's past work would be available if the person was limited to unskilled work due to pain and depression, precluding the ability to carry out detailed instructions, and the vocational expert responded that her past work would not be available. The vocational expert also testified that her past work would not be available if handling, fingering, and feeling were reduced to occasional. The vocational expert

28

indicated that the plaintiff would have skills that would transfer to several sedentary jobs but that occasional manipulative limitations would preclude those jobs (Tr. 137).

## ANALYSIS

The plaintiff argues that the ALJ erred by (1) failing to properly evaluate the demands of her past relevant work and (2) failing to properly assess her residual functional capacity ("RFC"). The plaintiff further argues that the case should be remanded for consideration of new and material evidence submitted to the Appeals Council  (doc. 12 at 34-39).

### Past Relevant Work

As set out above, at the administrative hearing, the vocational expert identified the plaintiff's past relevant work as that of an occupational health specialist and testified that the *DOT* characterized the job as light, skilled work, with an SVP of 6 (*DOT* No. 168.167-062). The vocational expert further testified that the plaintiff's past relevant work was "[a]lso performed at the light level" (app. 135).  In response to the ALJ's hypothetical incorporating the limitations in the RFC assessment, the vocational expert testified that the plaintiff's past relevant work would be available. When the ALJ asked whether he was referring to "actually performed, generally performed, or both," the vocational expert responded, "Both" (Tr. 136).  At step four of the sequential evaluation process, the ALJ found as follows:

> The [plaintiff] has past relevant work as an occupational health specialist (*DOT* 168.167-062), which was light, skilled/SVP-6 work, and *which she performed at the light exertional level*. . . . I have determined that the claimant has the [RFC] to perform a reduced range of light work.
>
> In comparing the [plaintiff's RFC] with the physical and mental demands of this work, I find that the claimant is able to perform it *as actually and generally performed*. This finding is supported by the testimony of the vocational expert, who testified that an individual with the [plaintiff's] age, education, work experience, and [RFC] would be able to perform the requirements of this

> job. Pursuant to SSR 00-4p, the vocational expert's testimony
> is consistent with the information contained in the [*DOT*] and is
> accepted.

(Tr. 113-14) (emphasis added).

The plaintiff argues that remand is required because substantial evidence does not support this finding. "Past relevant work" is defined by the regulations as "work that you have done within the past 15 years, that was substantial gainful activity, and that lasted long enough for you to learn to do it." 20 C.F.R. § 404.1560(b)(1). The ALJ must consider whether a claimant has the RFC to "meet the physical and mental demands of jobs a claimant has performed in the past (either the specific job a claimant performed or the same kind of work as it is customarily performed throughout the economy)," and, if the claimant can return to her past relevant work, she may be found to be "not disabled." SSR 82–62, 1982 WL 31386, at *3. Social Security Ruling ("SSR") 82–61 sets out three tests an ALJ may use in determining whether an individual can do past relevant work: (1) whether the claimant can perform a past relevant job "based on a broad generic, occupational classification of that job, e.g., 'delivery job,' 'packaging job,' etc. Finding that a claimant has the capacity to do past relevant work on (this) basis is likely to be fallacious and unsupportable"; (2) whether the claimant can perform the functional demands and job duties "peculiar to an individual job as he or she actually performed it"; or (3) whether the claimant has the capacity to perform the job as ordinarily required by employers, often utilizing the *DOT*. 1982 WL 31387, at *1-2. Further, SSR 82-62 provides:

> The claimant is the primary source for vocational documentation, and statements by the claimant regarding past work are generally sufficient for determining the skill level; exertional demands and nonexertional demands of such work. Determination of the claimant's ability to do [past relevant work] requires a careful appraisal of (1) the individual's statements as to which past work requirements can no longer be met and the reason(s) for his or her inability to meet those requirements; (2) medical evidence establishing how the impairment limits ability to meet the physical and mental requirements of the work; and

> (3) in some cases, supplementary or corroborative information from other sources such as employers, the [*DOT*], etc., on the requirements of the work as generally performed in the economy.

1982 WL 31386, at *3. SSR 82-62 also requires the following when the decisionmaker determines that a claimant can meet the physical and mental demands of past relevant work:

> The rationale for a disability decision must be written so that a clear picture of the case can be obtained. The rationale must follow an orderly pattern and show clearly how specific evidence leads to a conclusion.
> * * *
> In finding that an individual has the capacity to perform a past relevant job, the determination or decision must contain among the findings the following specific findings of fact:
> 1. A finding of fact as to the individual's RFC.
> 2. A finding of fact as to the physical and mental demands of the past job/occupation.
> 3. A finding of fact that the individual's RFC would permit a return to his or her past job or occupation.

*Id*. at *3–4.

Here, the ALJ made a factual finding that the plaintiff "performed [her past relevant work] at the light exertional level," relying on the *DOT*'s description of the occupational health specialist job and the vocational expert's testimony (Tr. 113-14). At the administrative hearing, neither the vocational expert nor the plaintiff provided testimony regarding the demands of the plaintiff's past relevant work as she actually performed it, other than the vocational expert's conclusory testimony that the work was "performed at the light level" (app. 135). However, there are two documents in the record in which the plaintiff provided a description of the physical demands of the job as she actually performed it. The first is the plaintiff's disability report - adult (Form SSA-3368) (Tr. 309-22). In that form, the plaintiff indicated the following physical demands of her job as an "occupational safety specialist" from April 2008 to September 2014: walking for one hour per day; standing for

31

half an hour per day; sitting for six hours per day; climbing, stooping, handling large objects, and reaching for half an hour per day; writing, typing, or handling small objects for six hours per day; and frequently lifting ten pounds, with the heaviest weight lifted being 50 pounds (Tr. 313). The plaintiff further stated:

> 55% of time was allocated to data entry, report writing, reading & applying regulations, communicating in writing and by phone with clients and potential clients, developing & performing client training and community outreach where sometimes I needed to take along a laptop, maintaining files and coordinating staff training and 45% to conducting site inspections at the businesses[,] which sometimes included construction sites. I carried a metal document portfolio on site inspections and had to be prepared for extensive standing, walking, stair climbing and sometimes heat exposure.

(Tr. 312). The second document is a letter from the plaintiff to the disability examiner at the time of the initial denial of her claim, in which the plaintiff described her occupational safety specialist job as entailing "onsite visits and related outreach activities in the field" approximately 25% of the time, during which she carried a laptop and/or a travel case with handouts that at times weighed "well in excess" of 20 pounds, while 75% of her time  was spent on office-related duties (Tr. 188-89).

The Commissioner argues that the evidence that the plaintiff submitted regarding her job duties "is not conclusive on this point[,] and it is understandable why [the ALJ] decided that [the plaintiff] could do her job as actually performed" (doc. 13 at 9). The Commissioner goes on to recite the plaintiff's description of her job and then states, "Thus, the evidence provided . . . demonstrates that there were occasional exceptions, but [the plaintiff's] job, as she actually performed it, generally entailed office work, which required no more than 1.5 hours standing/walking, 6 hours sitting, and lifting no more than 10 pounds, which is equivalent to light work" (*id.* at 10). While this may well have been the vocational expert's reasoning for stating that the plaintiff could perform her past relevant work as actually performed, no such testimony was provided at the hearing, and there is

32

no indication in the record that the vocational expert or the ALJ acknowledged that the evidence provided by the plaintiff indicated that her job, as she actually performed it, at times demanded a higher exertional capacity than the *DOT*'s description of the job. Without such consideration and explanation, the undersigned cannot determine whether there is substantial evidence to support the ALJ's decision that the plaintiff has the RFC to perform her past relevant work as she actually performed it.[2]

The Commissioner argues that because the ALJ also found that the plaintiff could perform her past relevant work *as generally performed*, the plaintiff's argument for remand should be dismissed (doc. 13 at 11).  The undersigned agrees that such an error may in some instances be considered harmless. *See Gossett v. Berryhill*, C.A. No. 5:17-78-AMQ, 2018 WL 4113313, at *2 & n.1 (D.S.C. Aug. 29, 2018) (adopting magistrate judge's finding that "although the ALJ erred in determining Plaintiff could perform his past relevant work as he actually performed it, any error was harmless because the ALJ ultimately determined Plaintiff could perform the job as generally performed . . . "). Here, however, for the following reasons, the undersigned recommends that the case be remanded for further consideration.

First, as pointed out by the plaintiff (doc. 12 at 35-36), if she was found unable to perform her past relevant work and her skills were found to be not transferable, a finding of disability would be directed by the Medical-Vocational Guidelines Rule 202.06 when she turned 55 years old. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 202.06.  The plaintiff's 55th birthday was on April 17, 2015, three years prior to the ALJ's decision in this case (Tr. 114, 141).

---

[2]  In her reply brief, the plaintiff argues that the vocational expert also failed to consider, and the ALJ failed to ask, whether the plaintiff's past relevant work should be characterized as a composite job (doc. 18 at 2-3). This issue was not raised in the plaintiff's initial brief (*see generally* doc. 12), so the Commissioner did not have an opportunity to respond to it. Nonetheless, as the undersigned recommends that this matter be remanded for further consideration, the ALJ should also consider this issue.

Further, as noted above, the *DOT* classification used by the vocational expert and accepted by the ALJ for the occupational health specialist job (*DOT* no. 168.167-062) is at the light exertional level (Tr. 113).[3] As set out herein, the demands of this job as classified by the vocational expert varies from the plaintiff's description of the physical demands of her past relevant work. In *DeLoatche v. Heckler*, the Court of Appeals for the Fourth Circuit acknowledged that a claimant must "show an inability to return to her previous work (i.e., occupation), and not simply to her specific prior job," and an ALJ "may rely on the general job categories of the [*DOT*] as presumptively applicable to a claimant's prior work." 715 F.2d 148, 151 (4th Cir.1983) (citation omitted). The court noted, however, that "[t]he same label . . . may be used in a variety of ways. . . . The claimant may overcome the presumption that the Secretary's generalization applies by demonstrating that her duties were not those envisaged by the framers of the Secretary's category." *Id*.    In *DeLoatch*e, the Fourth Circuit remanded the case for additional evidence as to "the proper characterization of [the claimant's] relevant prior work," noting that it might be possible for the Secretary to demonstrate that it was "only [the claimant's] specific prior job, and not her occupation, which was not properly termed sedentary"; however, on the record before the court, it was not possible to make such a determination. *Id.*

Here, the ALJ did not mention the plaintiff's own description of her past relevant work. Further, the ALJ failed to discuss the mental and physical demands of the plaintiff's past relevant work, other than a general reliance on the *DOT* and the testimony of the vocational expert, and she did not explain her finding that the plaintiff can perform her past relevant work as actually performed. Accordingly, the record does not permit meaningful review of the ALJ's determination that the plaintiff can perform her past relevant work. *See Wilson v. Colvin*, C.A. No. 5:13-1998-RBH, 2015 WL 1268033, at *7-8 (D.S.C.

---

[3] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567.

Mar. 19, 2015) (remanding for further consideration at step four). As such, the case should be remanded for further findings regarding the plaintiff's past relevant work, including the physical and mental demands of the work with consideration of the plaintiff's description of the work. *See Turrentine v. Colvin*, C.A. No. 1:15CV00256, 2016 WL 225699, at *5-6 (M.D.N.C. Jan. 19, 2016) (finding that because, among other reasons, the plaintiff's past relevant work as she described it was at the light exertional level, whereas the *DOT* occupation used by the vocational expert and the ALJ qualified as sedentary, substantial evidence failed to support the ALJ's use of that *DOT* classification in analyzing the plaintiff's past relevant work).

### *Remaining Allegations of Error*

In light of the court's recommendation that this matter be remanded for further consideration, the court need not address the plaintiff's remaining issues, as they may be rendered moot on remand. *See Boone v. Barnhart*, 353 F.3d 203, 211 n.19 (3rd Cir. 2003) (remanding on other grounds and declining to address claimant's additional arguments). Moreover, if necessary, the plaintiff may present her remaining arguments concerning the ALJ's alleged errors on remand.

## CONCLUSION AND RECOMMENDATION

Based on the foregoing, the court recommends that the Commissioner's decision be reversed pursuant to sentence four of 42 U.S.C. § 405(g) and that the case be remanded to the Commissioner for further consideration as discussed above.

IT IS SO RECOMMENDED.

April 30, 2020                                           s/Kevin F. McDonald
Greenville, South Carolina                              United States Magistrate Judge

***The attention of the parties is directed to the important notice on the following page.***

35

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
300 East Washington Street
Greenville, South Carolina 29601

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).